ORIGINAL
FILED

07 JUL 25 PM 2:50

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

JULIE A. SHEPARD, SBN 175538
SHAILA DJUROVICH, SBN 224249
HOGAN & HARTSON L.L.P.
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601
jashepard@hhlaw.com
smdjurovich@hhlaw.com

Attorneys for Defendant
ITN ENERGY SYSTEMS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE BRANCH

C 07 03817 HRL

WAVEZERO, INC.,

Plaintiff,

v.

ITN ENERGY SYSTEMS, INC., and
DOES 1 through 20, inclusive,

Defendants.

Case No.:

[Complaint filed on June 19, 2007]

(LASC Case No. 107CV88201)

**COUNTERCLAIMS**

[DIVERSITY (28 U.S.C. §§ 1332, 1441(b) and 1446)]

1    Comes now Defendant and Counter-Claimant ITN ENERGY SYSTEMS,

2    INC. ("ITN") and states as follows:

3    ## INTRODUCTION

4    1.    Defendant WAVEZERO, INC. ("WAVEZERO") asked ITN to build

5    several machines to be used in the development of a new, and purportedly very

6    economical, process for manufacturing radio frequency identification tags ("RFID

7    tags"). While ITN did not believe that technology WAVEZERO sought to develop

8    would serve its intended purpose and informed WAVEZERO of this opinion, ITN

9    agreed to build several machines to be used in WAVEZERO's research and

10   development efforts.

11   2.    ITN built the machines and they were delivered to, and accepted by,

12   ITN and a third party Mu-Gahut Enterprises, LLC ("Mu-Gahut"). As soon as the

13   machines were delivered, WAVEZERO's parent company, Block Shield

14   Corporation ("Block Shield") represented to the public and third parties that they

15   had developed a commercially viable and low cost technology for manufacturing

16   RFID tags. This was, of course, incorrect. WAVEZERO was still in the midst of

17   developing that technology and had received, as most, prototype machines for use

18   in its research and development efforts.

19   3.    WAVEZERO proceeded to use these machines, or cause others to use

20   them for, commercial production.  In the process, WAVEZERO abused the

21   machines by employing untrained engineers to operate them, failing to properly

22   maintain them, and operating the machines well beyond the performance

23   parameters established by ITN.  Not surprisingly, these mistakes damaged the

24   machines and WAVEZERO began to complain to ITN that they were not operating

25   correctly.  WAVEZERO also refused to pay ITN the final $200,000 due to ITN

26   under the parties' contract. At the same time, Block Shield was representing to the

27   public that the machines were a "breakthrough" for its business.

28   4.    Despite the fact that it was not required to do so, ITN repaired the

1  damage WAVEZERO caused to its machines. However, WAVEZERO still
2  refused to pay ITN as required by the parties' Contract (as defined in Paragraph 10
3  herein). After ITN repeatedly demanded full payment over a period of nearly a
4  year, and made clear its intention to sue WAVEZERO if that payment was not
5  made, WAVEZERO preemptively filed this suit to avoid being sued in Colorado.
6  ITN brings its counterclaims to recover the monies owed to it under the parties'
7  contract and other damage caused by WAVZERO's misconduct.

8                    **PARTIES, JURISDICTION, AND VENUE.**

9        5.    At all times related herein, Plaintiff ITN was a Colorado corporation
10  doing business in the state of Colorado.

11        6.    ITN alleges that, upon information and belief, Defendant
12  WAVEZERO is a California corporation with its principal place of business in the
13  County of Santa Clara, California.

14        7.    This Court has original jurisdiction over the claims asserted in this
15  complaint pursuant to 28 U.S.C. § 1332 in that this action is between citizens of
16  different States and the amount in controversy exceeds $75,000.

17        8.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b), in that
18  the Plaintiff resides in this district, and a substantial portion of the events and
19  omissions giving rise to the claim occurred in this district.

20                         **COMMON ALLEGATIONS**

21        9.    In March, 2005 WAVEZERO approached ITN for assistance in its
22  efforts to apply certain vacuum deposition technologies in a purportedly low-cost
23  process for manufacturing RFID tags.

24        10.    ITN informed WAVEZERO that currently available vacuum
25  deposition technology WAVEZERO intended to use would not be able to produce
26  RFID tags at the low price per unit that WAVEZERO hoped to achieve.
27  WAVEZERO dismissed these concerns, indicated that it "already had a customer
28  that agreed to buy the technology" and asked ITN to build several machines to be

1    used by WAVEZERO for the limited and only purpose of its continued research
2    and development efforts.

3        11.    Via a contract proposal dated October 28, 2006 (the "Contract") ITN
4    offered to build the two roll-to-roll vacuum deposition machines, the TF50 and
5    TF55, that are at issue in this litigation. A copy of the Proposal is attached hereto
6    as Exhibit 1.

7        12.    In the technology industry, it is commonly understood that machines
8    developed for research and development purposes are less robust, and require more
9    maintenance, than machines used for commercial purposes. ITN and WAVEZERO
10   both understood this distinction when they entered into the Contract and both
11   understood that ITN was building research and development machines, not
12   commercial production machines. The Contract itself specifically and repeatedly
13   states that the Machines are for "R&D and Pilot Production" purposes, not for use
14   in commercial manufacturing.

15       13.    On or around October 31, 2005 WAVEZERO accepted ITN's offer via
16   a purchase order (the "Purchase Order"), a copy of which is attached thereto as
17   Exhibit 2.

18       14.    Pursuant to Paragraph G.1 of the Contract, WAVEZERO was required
19   to pay ITN 50% of the total contract price of $1,190,000.00 when WAVEZERO
20   submitted the signed Contract and 50% of the total contract price "upon notification
21   of system shipment by ITNES to [WAVEZERO]."

22       15.    Also pursuant to the Contract, WAVEZERO had the option of
23   approving the Machines before they were shipped pursuant to a specific
24   performance guarantee and acceptance test procedure outlined in the Paragraph G.8
25   of the Proposal.

26       16.    On January 28, 2006 WAVEZERO and ITN employees tested the
27   Machines at ITN's facilities in Colorado pursuant to the Contract. The Machines
28   passed acceptance tests as defined in Paragraph G.8 of the Contract.

17. On February 27, 2006 WAVEZERO's parent company, Block Shield Corporation ("Block Shield") issued a press release (the "February 27, 2006 Press Release") stating that Block Shield and WAVEZERO had partnered with a third party, Mu-Gahut, LLC ("Mu-Gahut") and had sold it one machine to be used in "manufacturing" RFID tags. A copy of this press release is attached hereto as Exhibit 3. Upon information and belief, the February 27, 2006 Press Release referred to one of the Machines.

18. On February 28, 2006 WAVEZERO's Chief Executive Officer, Pierre Antoniucci ("Antoniucci") contacted ITN and informed ITN that the TF50 and TF55 (collectively, the "Machines") had been sold to Mu-Gahut, and that this Mu-Gahut would like to accept delivery of the Machines at ITN's offices in Colorado so that Mu-Gahut's employees could be trained to operate the Machines on-site by ITN's personnel. ITN complied with this request. Copies of emails evidencing Antoniucci's request for on-site delivery at ITN's facilities and ITN's compliance with that request are attached hereto as Exhibit 4.

19. In other discussions that occurred on or around February 28, 2006, WAVEZERO indicated to ITN that WAVEZERO had sold the Machines to Mu-Gahut at a profit of over 100%.

20. After Mu-Gahut's employees failed to show up for the training contemplated by Antoniucci in Exhibit 4, the Machines were subsequently delivered to WAVEZERO in March, 2006 at the direction of Antoniucci (not in December, 2006 as claimed in the Complaint). Copies of emails evidencing his request and the subsequent shipments are attached hereto as Exhibit 5.

21. Despite the fact that the Machines had been delivered to WAVEZERO, WAVEZERO paid less than half of the remaining $595,000 due to ITN under the Contract in violation of Paragraph G.1 of the Contract.

22. On April 20, 2006 Block Shield issued another press release (the "April 20, 2006 Press Release") stating that it had "taken delivery" of four

1    machines (including the Machines issue in this litigation) and praising the machines
2    at length as a "milestone" for the company and a "breakthrough" in RFID
3    technology.    A copy of the April 20, 2006 Press Release is attached hereto as
4    Exhibit 6.   The April 20, 2006 Press Release unambiguously indicates that the
5    Machines were being used for research and development purposes.  In pertinent
6    part, it states:

7        … [O]ne [of the Machines] has been dedicated to the Company's RFID
8        antenna ***Research and Development lab***, one is operating for the
9        Company's first US licensee and the remaining two are actively
10       running ***prototype*** rolls of RFID antennas …(emphasis added).

11   Upon information and belief, the April 20, 2006 Press Release referred to the
12   Machines.

13       23.    After the Machines were delivered to WAVEZERO, and (according to
14   the April 12, 2006 Press Release) after they were in active use by WAVEZERO for
15   over a month, they were again tested by ITN and WAVEZERO employees on or
16   around May 12, 2006.   That same day, WAVEZERO's chief engineer, Fabrizio
17   Montauti ("Montauti"), sent an email to ITN attaching a report stating the Machines
18   had passed all passed all but three "acceptance tests."  Contrary to the allegations
19   raised repeatedly in the Complaint, Montauti's report specifically states that the
20   Machines passed the "automatic" operation mode test.  A copy of Montauti's email
21   and report are attached to ITN's Answer as Exhibit 7.

22       24.    While ITN promptly remedied each of the three problems identified in
23   Montauti's report, these problems did not effect ITN's right to payment under the
24   Contract.  Specifically, Paragraph G.7 of the Contract gives ITN three (3) months
25   after delivery of the Machines to bring them into compliance with all applicable
26   specifications while payment is due immediately upon delivery of the Machines
27   pursuant to Paragraph G.8 of the Contract.  Furthermore, the problems identified by
28   Montauti were not part of the performance specifications required by the Contract.

25.    On July 28, 2006 Block Shield issued another press release praising its new process for RFID production (the "June 28, 2006 Press Release") and indicating that it had sold another RFID production machine to Mu-Gahat.    In pertinent part, the June 28, 2006 Press Release states:

> Block Shield's RFID technology is by far the most competitive
> industrial production methodologies in the RFID industry. It is our
> belief that Mu-Gahat's success in attracting such substantial third
> party commitment is in part due to the compelling features and cost
> effectiveness of Block Shield's proprietary production techniques.

A copy of the June 28, 2006 Press Release is attached hereto as Exhibit 8.  Upon information and belief, the June 28, 2006 Press Release referred, in part, to the Machines.

26.    At the same time, WAVEZERO refused to make full payment to ITN under the Contract.

27.    By August, 2006 WAVEZERO made additional complaints to ITN regarding various alleged "problems" with the Machines.  ITN and WAVEZERO agreed on or around August 7, 2006 that ITN would attempt to address a limited set of specified problems in exchange for full payment of the $300,000 still due and owing under the Contract (the "August 7, 2006 Agreement").  A copy of an email exchange between Antounuicci and ITN's Chief Executive Officer, Dr. Mohan Misra ("Dr. Misra"), memorializing this agreement is attached hereto as Exhibit 9.

28.    Pursuant to the Contract, WAVEZERO was to pay $100,000 to ITN immediately and the remaining $200,000 in progress payments as ITN completed the agreed upon work.

29.    ITN conducted an inspection of the Machines on August 18, 2006 and determined that WAVEZERO had operated the Machines beyond the process parameters recommended by ITN. Among other things, ITN determined that WAVEZERO had operated the Machines without proper maintenance and at

1 speeds, power levels, and long periods of continuous operation that exceeded ITN's
2 recommendations for use of the Machines.  In short, it appeared to ITN that
3 WAVEZERO had attempted to run the Machines as commercial production
4 machines rather than as the research and development tools contemplated by the
5 parties.

6       30.    During this inspection ITN also determined that WAVEZERO had
7 allowed engineers who did not have sufficient training and experience to operate
8 the Machines, thereby contributing to the problems WAVEZERO was allegedly
9 experiencing with the Machines.

10       31.    Upon information and belief, WAVEZERO fired at least two of these
11 engineers in September, 2006 after WAVEZERO determined that he was not
12 qualified to operate the Machines.  ITN subsequently assisted WAVEZERO in
13 creating a job description that WAVEZERO could use to solicit a replacement for
14 this employee.

15       32.    ITN determined that WAVEZERO's misuse of the Machines, and its
16 decision to employ unqualified engineers to operate them, had damaged the
17 Machines and was responsible for most of the various problems complained of by
18 WAVEZERO.

19       33.    Despite the fact that ITN was not contractually responsible for
20 repairing damage to the Machines caused by WAVEZERO's abuse, ITN agreed to
21 honor its agreement with WAVEZERO and fix a discrete list of problems in
22 exchange for full payment of the $300,000 owed to it under the terms of the
23 Contract.

24       34.    WAVEZERO paid ITN $100,000. However, after ITN had addressed
25 the problems described by WAVEZERO, WAVEZERO still refused to pay the
26 remaining $200,000 that it owed to ITN.

27
28

# FIRST CAUSE OF ACTION
## (Breach of Contract)

35.    ITN realleges and incorporates each and every foregoing paragraph of this Complaint as though fully set forth herein.

36.    As set forth above, the parties entered into a Contract on or around October 31, 2005 under which ITN was to manufacture the Machines in exchange for a payment of $1,190,000.

37.    Pursuant to the terms of the Contract, WAVEZERO was obligated to pay $595,000 upon submitting its order to ITN and another $595,000 when the Machines were delivered to WAVZERO.

38.    WAVEZERO paid $595,000 upon submitting its order.

39.    ITN delivered the Machines to WAVEZERO on February 28, 2006 per WAVZERO's instructions and physically shipped the Machines to WAVEZERO in March, 2006 per WAVEZERO's written instructions.

40.    WAVEZERO did not pay the full $595,000 due upon delivery of the Machines under the Contract.

41.    To date, WAVEZERO has still not paid $200,000 owed to ITN under the Contract.

42.    ITN has performed, or been excused from performing, all conditions, convenants, and promised required to be performed on its part in accordance with the terms of the Contract.

43.    WAVEZERO breached the parties' Contract by refusing to pay ITN upon delivery of the Machines.

44.    As a result of WAVEZERO's breaches of the Contract, ITN has suffered damages in an amount to be determined by trial, but no less than $200,000, plus interest thereon at the maximum rate permitted by law.

## SECOND CAUSE OF ACTION
### (Breach of August 7, 2006 Agreement)

45.    ITN realleges and incorporates each and every foregoing paragraph of this Complaint as though fully set forth herein.

46.    On or around August 7, 2006 ITN agreed to repair a discrete set of alleged problems with the Machines.  WAVEZERO agreed to pay ITN $300,000 for that work, including a $100,000 up front payment and $200,000 in progress payments.

47.    ITN has performed, or been excused from performing, all conditions, convenants, and promised required to be performed on its part in accordance with the terms of the August 7, 2006 Agreement.

48.    WAVEZERO did not make progress payments to ITN as contemplated by the August 7, 2006 Agreement, thereby breaching that Agreement.

49.    As a result of WAVEZERO's breaches of the August 7, 2006 Agreement, ITN has suffered damages in an amount to be determined by trial, but no less than $200,000, plus interest thereon at the maximum rate permitted by law.

## THIRD CAUSE OF ACTION
### (Unjust Enrichment)

50.    ITN realleges and incorporates each and every foregoing paragraph of this Complaint as though fully set forth herein.

51.    By receiving and/or taking possession of the Machines without justly compensating ITN, and by refusing, and continuing to refuse to pay ITN for the Machines, WAVEZERO now owes ITN an amount to be determined by trial, but no less than $200,000, plus interest thereon at the maximum rate permitted by law.

52.    WAVEZERO has benefited and continues to benefit from the debts that it has failed to pay to ITN.

53.    WAVEZERO has benefited and continues to benefit from upgrades and repairs ITN made to the Machines under the terms of the August 7, 2006

**COUNTERCLAIMS**

Agreement for which ITN has not been paid.

54.    ITN alleges, upon information and belief, that WAVEZERO has the money to pay the amounts due to ITN, but is unfairly and in bad faith refusing to pay such amounts to ITN.

55.    WAVEZERO is being unjustly enriched by retaining money that is equitably due to ITN.  WAVEZERO's refusal to reimburse ITN the money that is due to ITN would result in an unconscionable and unjust enrichment of WAVEZERO at ITN's expense.

56.    WAVEZERO should be required to disgorge all benefits received from its failure to pay ITN in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Foreclosure of Security Interest)

57.    ITN realleges and incorporates each and every foregoing paragraph of this Complaint as though fully set forth herein.

58.    Pursuant to Paragraph G.10 title to the Machines did not pass to WAVEZERO until ITN was paid in full under the Contract.

59.    By operation of law, this provision creates a security interest in the Machines in favor of ITN up to the amount that WAVZERO owes to ITN under the Contract.

60.    As stated above, WAVEZERO has failed to pay $200,000 owed to ITN under the Contract.

61.    Because WAVEZERO has failed to pay ITN as required by the Contract, ITN is entitled to foreclose its security interest in the Machines or the proceeds thereof.

## FIFTH CAUSE OF ACTION
### (Fraud and Deceit)

62.    ITN realleges and incorporates each and every foregoing paragraph of this Complaint as though fully set forth herein.

1     63.    WAVEZERO made numerous false promises, misrepresentations, and

2   fraudulent omissions of fact to ITN with the intent to deceive ITN and to induce

3   ITN to rely on those statements to their detriment. Specifically:

4     a.    On or around August 7, 2006, Antonuicci, acting on behalf of

5   WAVZERO, represented orally and in writing to Dr. Misra, acting on behalf of

6   ITN, that WAVEZERO would repay the $300,000 that it owed to ITN pursuant to

7   the terms of the August 7, 2006 Agreement. Upon information and belief,

8   Antonuicci made this promise, and entered into the August 7, 2006 Agreement,

9   without having any intention of ever paying ITN the remaining $300,000 owed to it

10  under the Contract.

11    b.    In July, August, and September, 2006 Antonuicci, acting on behalf of

12  WAVEZERO made, or caused others to make, various oral and written statements

13  to Dr. Misra that suggested alleged problems with the Machines were the fault of

14  ITN.   In fact, WAVZERO had been operating the Machines without proper

15  maintenance, without qualified operators, and at speeds, power levels, and long

16  periods of continuous operation that exceeded ITN's recommendations for use of

17  the Machines.

18    64.    Antonuicci intentionally concealed, suppressed, withheld and

19  misrepresented these facts with the intent of deceiving ITN and with the intent that

20  ITN would rely on those misrepresentations to its detriment.   Specifically,

21  Antonuicci intended to fraudulently induce ITN to enter into the August 7, 2006

22  Agreement and to perform work thereunder or otherwise on the Machines that ITN

23  was not otherwise obligated to perform.   Antonuicci lied about the cause of

24  problems with the Machines to induce ITN to perform work on them that it was not

25  obligated to perform and with the intent of causing ITN to make modifications to

26  the research and development machines WAVEZERO had ordered that would

27  make them more suitable for commercial production.

28    65.    ITN relied on each and every one of the false statements made by

1    Antonuicci and other WAVEZERO employees when it entered into the August 7,

2    2006 Agreement and thereafter spent time and money inspecting and working on

3    the Machines.

4        66.    At all relevant times, ITN's reliance on the statements made by

5    WAVZERO and its employees was justifiable.

6        67.    At all relevant times, WAVEZERO and its employees knew ITN

7    would rely on their fraudulent statements in the manner described above.

8        68.    At all relevant times, ITN did in fact rely on WAVEZERO and its

9    employees' fraudulent statements to its detriment.  Had ITN known the true facts

10   and WAVZERO's true intentions, ITN would not have entered into the Contract or

11   August 7, 2006 Agreement or traveled to California to inspect the Machines.

12       69.    As a proximate and direct cause of the materially false statements and

13   nondisclosures on the part of WAVEZERO and its employees, ITN sustained

14   damages and injuries by, among other things: (a) entering into a contracts under

15   fraudulent pretenses; (b) incurring costs and expenses to determine that damage to

16   the Machines was caused by WAVZERO; and (c) dedicating manpower and

17   expertise to determining the true cause of damage to the Machines caused by

18   WAVEZERO.  The amount of damages suffered by ITN will be determined at trial.

19       70.    The  aforementioned  conduct  was  willful,  wanton,  malicious,

20   oppressive, and intended to cause ITN harm, thereby justifying an award of

21   exemplary and punitive damages, as authorized under California Civil Code

22   Section 3294.

## PRAYER

23   WHEREFORE, Plaintiff ITN prays for a judgment as follows:

24   1.    For compensatory damages in an amount to be proven at trial;

25   2.    For restitution of benefits in an amount to be proven at trial;

26   3.    For exemplary damages pursuant to California Code of Civil

27   Procedure Section 3294;

28

1     4.    For foreclosure of ITN's security interest in the Machines or their

2   proceeds;

3     5.    For all costs of suit incurred herein;

4     6.    For pre-judgment interest at the maximum rate of interest permitted by

5   law; and

6     7.    For such other and further relief as the Court deems just and proper.

7

8   DATE:  July 25, 2007            HOGAN & HARTSON LLP

9

10

11                       By:

12                       Julie A. Shepard
                           Shaila M. Diurovich

13                       Attorneys for Defendant
                        ITN ENERGY SYSTEMS, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**Wavezero Inc**
**425 Lakeside Drive**
**Sunnyvale, Ca. 94085**

**PURCHASE ORDER**
**# 1763-00**
**October 27, 2005**

**Tel- 408-745-0561**
**Fax- 408-745-6584**

**Vendor**
ITN Energy Systems
8130 Shaffer Parkway
Littleton, CO 80127
USA

**Bill To/Ship To:**
Wavezero Inc.
425 Lakeside Drive
Sunnyvale, Ca. 94085
USA

| Item: | Quantity | Description | Unit Cost | Extended Cost | |
|---|---|---|---|---|---|
| 1 | 1 | Engineering retrofit and trial Static Sputtering Machine | 250,000.00 | 250,000.00 | A5 |
| 2 | 2 | Roll to roll Sputtering Machine | 220,000.00 | 440,000.00 | $470,000 |
| 3 | 2 | Engineering Roll to Roll Fitting Trials and Test | 250,000.00 | 500,000.00 | $470,000 |
| | | **Total Extended Price** | | **1,190,000.00** | |

**Terms and Conditions as per Proposal Number 2005/PB/WZ/CT 04 & 05
dated October 28, 2005.**

*[handwritten] 10/31/05*

*Payment terms per proposal - attached -*
*50% x $1,190,000 = $595,000.*

*[signature]*

Exhibit 1

*15*



<u>October 28, 2005</u>

# *Quotation Specification Proposals*

FOR

WAVEZERO, INC
425 Lakeside Drive
Sunnyvale, CA 94085

## DISCLOSURE STATEMENT

This proposal and quotation includes proprietary data that shall not be disclosed, duplicated, or used – in whole or in part – for any purpose other than to evaluate this proposal and quotation.  If, however, a contract is awarded to this offeror as a result of or in connection with the submission of this proposal, the Buyer will have the right to duplicate, use, or disclose the data to the extent provided in the resulting contract.  This restriction does not limit the Buyer's right to use information contained in this proposal if it is obtained from another source without restrictions.  The data subject to this restriction are contained in the sheets of this document.  This data is further deemed by ITN to contain trade secrets and commercial or financial information that is privileged and confidential.

---

ITN Energy Systems, Inc.
8130 Shaffer Parkway, Littleton, CO  80127  USA
Telephone:  303-285-1824        Fax:  303-285-5179
pbhat@itnes.com
http//www.itnes.com

---

**Exhibit 2**

*16*

*Quote:* 2005/PB/WZ/CT-05

### Roll-to-Roll Sputtering System-Upgrade Option
(R & D and Pilot Production Tool)

### CUSTOMER REQUIREMENTS

Upgrade existing static deposition system to a Roll-Roll Sputtering System and includes following,

- The vacuum deposition system will process substrates, 300 mm wide rolls of polyester (PET) / vinyl material. Core internal diameter 75 mm approximately, maximum roll diameter 150 mm approximately
- The web mechanism should be able to accommodate a fixed or rotating mask capability (Wavezero to design the fixed or rotating mask)
- Speed of roll between 1 –10 cm/min
- ITN will install the machine in USA

## A.   THE SYSTEM PERFORMANCE

A.1. Applicable substrates

| | |
|---|---|
| A.1-2. Substrate type | Flexible rolls of PET/Vinyl |
| A.1-3. Substrate size | Max 300 mm width, length 150 m |
| A.1-3. Deposition area | 300 mm width |
| A.2. Coating Drum cooling | Inside water cooling, 20°C |
| A.3. Distance, source and substrate | Up to 75 mm |

## B.   THE DEPOSITION SYSTEM

The proposed deposition system will be similar to the ITN model, Belljar R&D, and include Roll-to-Roll Deposition system. The upgrade consists of a support structure and controls for a web handling module. This configuration will process flexible webs of widths up to 300 mm and 150 m in length.

2

*17*

**B.1    Cathode Accommodation**

      ITNES will provide additional cathode and the associated hardware.

**B.2    Sputtering Power Supply**

      ITNES, will supply additional set of DC sputtering power supply

- The system will be capable of at least $2 \times 10^{-6}$ Torr vacuum at ambient.

**B.3    Web Handling Mechanism**

- The web handling mechanism will process a roll of plastic material and will be fully reversible.

- The web handling module will move the web along rollers, directing the web to move on a large coating drum (made of stainless steel material) through the process zone. The drum can be cooled to 20°C and reheated to help to reduce condensation. The winding speed can be varied.

- **ITN will also provide means for a metal mask to move continuously on best effort basis. However, It will be responsibility of the customer to make the mask work.**

- A number of guiding rollers will guide the roll. All guide rollers, take up and unload rollers will be "balanced" and made of aluminum.

- All rotary feedthru's will be lubricated made by Ferrofludics.

- Web shields will be provided at appropriate locations.

## *Quote:* 2005/PB/WZ/CT-04
### Roll-to-Roll Sputtering Systems
R & D and Pilot Production Tool

### CUSTOMER REQUIREMENTS

- The vacuum deposition system requested is a sputtering system with capabilities to deposit thin films of Aluminum and Copper of thickness up to 4 micron with rates of 100A/sec on best effort basis
- Deposition on one side of the substrate
- Substrates, 300 mm wide rolls of polyester (PET) / vinyl material. Core internal diameter 75 mm approximately, maximum roll diameter 150 mm approximately
- The web mechanism should be able to accommodate a fixed or rotating mask capability (Wavezero to design the fixed or rotating mask)
- DC magnetron sputtering method
- Fully automated computer controlled system
- Room temperature deposition, cooled drum required
- Vacuum capability of at least $2 \times 10^{-6}$ Torr, without web, at ambient temperature.
- ITN to supply targets for initial runs but Wavezero to buy targets for production.
- Speed of roll between 1 –10 cm/min
- ITN will install the machine in USA

## A.   THE SYSTEM PERFORMANCE

A.1. Applicable substrates

| | |
|---|---|
| A.1-2. Substrate type | Flexible rolls of PET/Vinyl |
| A.1-3. Substrate size | Max 300 mm width, length 150 m |
| A.1-3. Deposition area | 300 mm width |
| A.2. Tact time | NA |
| A.3. Substrate heating | None |
| A.4. Coating Drum cooling | Inside water cooling, 20°C |
| A.5.   Film thickness uniformity | |
| A.5-1. Within substrate thickness | ±10% |
| A.5-2. Deposition parameters | TO BE DETERMIND |

4

*19*

A.5-3. Uniformity parameters            TO BE DETERMIND

A.5-4. Target utilization               35% (or higher on best effort basis)

A.6. Deposition rate                    Up to 50Å/sec (up to 200Å/sec on best effort)

A.7. Ultimate vacuum level              below 2 x 10$^{-6}$ mbar

A.8. Chamber pressure range             1-10 mbar for sputtering

A.9. Chamber pressure accuracy within ±5%

A.10. Maximum gas flow rate             Argon gas flow rate of 500 sccm

A.11. Distance, source and substrate    Up to 75 mm

A.12. Operation mode                    Automatic, manual, maintenance modes

## B.    THE DEPOSITION SYSTEM

The proposed deposition system will be similar to the ITN model, Belljar R&D, and include Roll-to-Roll Deposition system.   The chamber will be cylindrical in shape and will comprise 0.7 m diameter approximately. This system consists of a support structure, control cabinet, electrical cabinet, and deposition modules with web handling module. This configuration will process flexible webs of widths up to 300 mm and 150 m in length. The system will have vacuum capability of at least 2 x 10$^{-6}$ Torr without web, at ambient temperature. The system is completely compatible with clean room applications. The stand alone electrical power distribution cabinet and instrumentation racks can each be located at specific and appropriate positions, either inside or outside the clean room. Mechanical pumps should be located outside of the clean room in accordance with local emissions and exhaust regulations. All utilities such as water, air, and nitrogen are distributed by a utility control panel conveniently located on the system frame.

Standard features include:

- All stainless steel construction (Deposition Module)
- Provision for handling of three (3) cathodes
- Vacuum capability of at least 2 x 10$^{-6}$ Torr
- Diffusion pump with a cold trap or a Cryo-pump for high vacuum process gas system during sputtering
- Single power input from facility.  Power distribution is conducted within the system.
- Single water input from facility.  Water distribution is conducted within the system.

5

## B.1.   Overall System Specifications

- The system will be fabricated at ITN, in Wheat Ridge, Colorado.
- The system will be capable of depositing sequential layers using a sputtering process
- The proposed system will operate under fully automated computer control, manual, and, maintenance with appropriate fail-safe interlocks.
- The system will be integral in terms of gas handling, pumping, etc.  As a result, the system will be versatile, reliable, and easy to maintain.
- Projected downtime for the system will be approximately 20%.

## B.2.   Deposition Module

### B.2.1 Pump System

Pumping system will be designed to industry standard high-vacuum practice. Pump plumbing will be vacuum tight-welded 304 stainless steel.  We will also provide analytical pump down times for the chamber volume to size of pumps with detailed drawings of pump system plumbing.

#### B.2.1.1 Process Pump

The process module includes one (1) high throughput process diffusion pump with a cold trap or a Cryo-pump.

#### B.2.1.2 Backing Pump

Each process module includes a Leybold D40BCS two stage rotary vane-backing pump and includes an integrated oil filtration system. All pumps use hydrocarbon based vacuum pump oil unless otherwise specified.

### B.2.2   Chamber

The chamber of the process module will be fabricated entirely from 304 stainless steel, with sufficient stiffeners to ensure structural integrity.  All standard vacuum industry standards will be met during manufacturing.

#### B.2.2.1 Access

The drive system and all cathodes will be accessible by moving the chamber up using a hoist.

#### B.2.2.2 Ports

The deposition module includes three two (2) inch glass windows to view the excited plasma volume.  Other view ports and feedthroughs can be included as options.

6

21

*B.2.3   Cathode Accommodation*

ITNES will provide three (3) sets of cathodes and the associated hardware.

*B.2.4   Sputtering Power Supplies*

ITNES, will supply three (3) sets of DC sputtering power supplies

*B.2.7   Gas Controls*

- Two- (2) channel process gas manifold is provided for the deposition module.

- The deposition module gas manifold features all stainless steel construction. Two gas channels will be supplied with electronic mass flow controllers (range of 0 to 500 sccm), with digital readout and electro-pneumatic valving.

- All process gases are controlled by a safety interlock system.

## B.3.  Vacuum System

*B.3.1   Pressure Readout*

- Process pressure is controlled in the deposition module via capacitance manometer readout, and an automatic throttle valve and controller (MKS) with control units placed in the control console to be easily accessible to operator. Pressure control accuracy is better than +/- 5% in the range of 1 to 100 mTorr. Pressure control will be relatively independent of gas flow.

- Included on each module are a cold cathode gauge for monitoring high vacuum and a pirani type gauge for monitoring backing pump performance.

- The system will be capable of at least $2 \times 10^{-6}$ Torr vacuum at ambient.

- All feedthrough flanges will be ASA or ISO-KF style.

- All fittings and O-rings will be completely vacuum compatible.

*B.3.2   System Controller, Data Logger*

- A complete computer control system for both process and mechanical control will be provided with the system.

- A Windows based software package will be provided within the control system.

- A maintenance mode will be provided, in which all interlocks can be over-ridden.

7

22

### B.4    Web Handling Mechanism

- The web handling mechanism will process a roll of plastic material and will be fully reversible.

- The web handling module will move the web along rollers, directing the web to move on a large coating drum (made of stainless steel material) through the process zone. The drum can be cooled to 20ºC and reheated to help to reduce condensation. The winding speed can be varied.

- **ITN will also provide means for a metal mask to move continuously on best effort basis. However, it will be responsibility of the customer to make the mask work.**

- A number of guiding rollers will guide the roll. All guide rollers, take up and unload rollers will be "balanced" and made of aluminum.

- All rotary feedthru's will be lubricated made by Ferrofludics.

- Web shields will be provided at appropriate locations.

### B.5    Electrical Requirements

*D.4.1  Basic Layout*

All signal power is isolated from system power.  Proper shielding and routing practices are followed.  All electrical and optical sensors are well protected from process contamination.  All wiring harnesses are numerically identified at each terminal.

*D.4.2  Main Power*

ITNES will provide all power requirements sixty-- (60) days after receipt of purchase order.  A single power input will be required from customer's facility. Power distribution will be controlled within the system.

*D 4.3  Enclosure*

All electrical wiring and components will be enclosed to avoid incidental contact with system operators.  A stand-alone control and power cabinet will be provided, this will allow for the operator to operate machine from one location.

*D.4.4  Electrical Wiring*

All electrical wiring will conform to standard accepted electrical safety practices and codes.

8

23

### B.6    Safety Standards

*D.5.1  Interlocks*

- The system is equipped with a safety interlock system that fully protects the operators and maintenance personnel from personal injury.

- The system is hard-wired with the system controller software interlocks as a redundant, backup system only.  Specific interlocks will be documented in the system manual.

- Water and vacuum interlocks for cathodes will be included.

*D.5.2  Safety Override*

- The system is equipped with a safety over ride.

- The system is designed to prevent damage in the event of shut off.

### B.7.    Computer Control Subsystem

- The control system is programmed using a commercial software package designed specifically for industrial control and monitoring.

- Fully automatic operation with event driven sequencing allows a variety of device structures to be produced.  The software will be customized according to the customer's requirements.

### B.8    Miscellaneous

*D.8.1  Labels*

Each piece of equipment is labeled with ITNES, Inc. part numbers where applicable. All electrical connections are labeled and mapped.

*D.8.2  Aesthetics*

The proposed system will be professionally finished to provide an attractive and safe laboratory environment.

*D.8.3  Maintenance Schedule*

9

A comprehensive maintenance schedule will be provided at the time of system commissioning.  With optional service contracts that can be fit to your needs.

*D.8.4  Spare Parts*

A list of recommended spare parts will be provided at the time of system commissioning.

10

25

## D.  PRICE

| ITEM | DESCRIPTION | QTY | PRICE | |
|------|-------------|-----|-------|---|
| | | | Unit | Extended |
| 1.0 | ENGINEERING RETROFIT AND TRIAL ON STATIC SPUTTERING MACHINE | 1 | $ 250,000.00 | $ 250,000.00 |
| 2.1 | ROLL TO ROLL SPUTTERING EQUIPMENT | 2 | $ 220,000.00 | $ 440,000.00 |
| 2.2 | ENGINEERING ROLL TO ROLL TRIALS AND TESTS | 2 | $ 250,000.00 | $ 500,000.00 |

### E. ITEMS INCLUDED IN PROPOSAL

- This quotation includes the following items: design, manufacture and testing of the equipment described in this proposal, buyoff at WaveZero facility, installation at WaveZero facility or any other facility in the USA, test running, and operation training.
- It is requested that the customer facilities and primary utilities be supplied free of charge during the period of the system set-up and test running.

### F. ITEMS NOT INCLUDED IN THIS PROPOSAL.

- Wiring of primary power supply
- Ducts and pits for secondary electrical wiring
- Primary piping
- Piping for rotary pump exhaust duct
- All other items are to be decided based on mutual discussion.

## G.    TERMS AND CONDITIONS

### G.1.  Terms of Payment

- Transmission of the proper confirmation of order
- 50% upon receipt of order and presentation
- 50% upon notification of system shipment by ITNES to Buyer

### G.2.  Warranty

Upon request in writing received by ITNES before the end of the first twelve (12) months after system acceptance at ITNES, ITNES shall repair or replace, at its

11

*26*

expense (excluding travel and per diem expenses incurred by ITNES employees who are sent to buyer's location, should buyer desire on-site repair), any item of the supplied system, which is inoperable or malfunctioning by the fault of ITNES, normal wear and tear excepted.

### G.3.  Delivery Schedule

**Delivery of the system will be on or before February 10, 2006.**

Sixty (60) days from receipt of purchase order and initial down payment, ITNES will submit a preliminary specification, for Buyer approval, regarding facilities including electrical, water, gas supply, suggested effluent handling procedures, and estimated heat load of system. Buyer is responsible for installation of gas source cabinets and associated piping to ITNES supplied gas control cabinet. Buyer is responsible for installation of scrubber system, if needed and all associated piping from point of exit of vacuum pump exhaust manifold of ITNES supplied equipment.

Buyer is responsible for any and all toxic gas monitoring and associated alarm systems and operation of this type of equipment in accordance with standards established for the installation of similar types of equipment in California. ITNES will provide sufficient safety interlocks and alarm signal outputs with system for interfacing with Buyer safety systems.

At about twelve (12) weeks from receipt of order, the system will be ready for preliminary acceptance by Buyer for shipment.  After preliminary acceptance, and before shipment, Buyer will receive a copy of the contract of carriage, departure and arrival time.  ITNES will bear the entire responsibility for the schedule. **The system can be shipped to any location in USA and costs will be paid by ITNES.**

### G.4.  Acceptance at ITNES, Inc

Upon completion of assembly of system at ITNES, Colorado, USA, ITNES will notify Buyer of said completion, and at such time Buyer will have the option of either authorizing shipment of system directly after notification, or of sending engineers for approval and authorization to ship.  ITNES will not be held responsible for any delays incurred not directly attributable to ITNES. The acceptance shall be based upon a mechanical, electrical and vacuum functional test.  At the completion of this test, a record of acceptance will be drawn up and presented to Buyer for approval for shipment.

ITNES will disassemble and package the system in accordance with ITNES standard packaging methods for international shipment.  System will be shipped by Air ride truck to Buyer's location.  **Buyer will be responsible for unloading and placing system in Buyer's lab buildings.**

12

27

### G.5.   Installation at Buyer's Facility

Upon notification of system arrival at Buyer and installation of necessary facilities have been accomplished, ITNES will dispatch a team of engineers for assembly and startup of the system. Buyer will make available, at no additional cost to ITNES, facilities, technicians and/or materials necessary to assist in the proper installation of the system at the Buyer lab site.

### G.6.   Training

Training of Buyer personnel in the proper maintenance, repair and basic operation of the system will be conducted in two stages: 1) three days of training will occur at ITNES's facility in conjunction with the preliminary acceptance test, and 2) one week of training will occur in conjunction with system assembly and startup at Buyer lab site. The total training period will be not less than one business week (five working days). The training will include detailed instruction in the operation, maintenance, and cleaning of the system.

### G.7.   Acceptance at Buyer's Facility

After completion of system installation, Buyer and ITNES personnel will conduct startup, and a basic functionality test of the system.  Mechanical and electrical systems, vacuum capability, and plasma discharge with argon inert gas will be demonstrated. Upon completion of installation and startup at Buyer's facility, a record of installation and startup acceptance will be drawn up and presented to Buyer for approval for release of funds as stated in the payment terms and conditions as stated in this quotation.

ITNES guarantees that the acceptance specification will be achieved within three months after delivery.  ITNES will not be held responsible for any delays incurred not directly attributable to ITNES.

After completion of the acceptance tests, a record of final acceptance will be drawn up and presented to Buyer for approval.  Final acceptance shall be deemed to be achieved upon unconditional approval by Buyer personnel.

### G.8.   Performance Guarantee

Acceptance at ITNES, Inc

At the completion of this test, a record of acceptance will be drawn up and presented to Buyer for approval and release of funds.

13

*28*



a) Mechanical
1. web transport is operational
2. chamber design meets agreed design specification
3. pumping valves and components functional

b) Electrical
4. all system power is functional
5. emergency power down procedures are defined and are functional
6. system gauging is operational
7. compliance to standards on a best effort basis

c) Vacuum
8. The deposition modules base pressures of <2 x 10$^{-6}$ Torr at ambient
9. Vacuum gauging is operational
10. The temperature of the coating drum to be <25°C

## G.9.  Right of Substitution

ITNES reserves the right to delete, add, or change any component of the system as long as the system or the end product performance is not changed.

## G.10.  Transfer of Title

The title shall be transferred from ITNES to Buyer upon 1) complete delivery of system to Buyer's facility; 2) countersignature of the acknowledgment of receipt; 3) receipt of payment by ITNES stated in Payment Terms.

## G.11.  Documentation

The documentation shall be part of the scope of supply and will be delivered together with the system.  It shall consist of the following:

- Complete basic operating instructions
- Circuit diagrams
- Operating instructions for the components from outside firms

The documentation is to be provided in duplicate and in <u>English</u>.

## G.12.  Quotation Viability

This quotation is valid for thirty (30) days from the date on the title page.

29





PRINTER FRIENDLY PAGE

## INVESTORS

**News Releases**
**Share Quote**
**Share Structure**
**Presentations**
**Research**
**Annual Reports**
**Corporate Governance**
**Events Calendar**
**Constitutional Documents**
**London Stock Exchange Documents**

## NEWS RELEASES

**Mon Feb 27, 2006**
**Sale of First RFID Manufacturing Machine**

Block Shield Corporation Plc, is pleased to announce that it has been selected by Mu-Gahut LLC as a key supplier of capital items, technical support and mass-production know-how for their major joint initiative - in association with the US Federal Department's General Services Administration ('GSA') - to elevate the industrial and technical capabilities of Native American Tribes with the aim of enhancing social equality and economic status through increase profitable economic growth and empowerment.

Consequently the Company is pleased to announce the sale of its first mass production RFID antenna machine for US$800,000 under an extensive agreeme that includes options for further future machine sales and a range of comprehensive licenses for ongoing technical support from Block Shield and its wholly owned subsidiary, WaveZero.

Pier Antonlucci, CEO, commented:

'Block Shield's inclusion in this initiative is a very important validation of our business model for the mass deployment of RFID component production. It widely known that the single largest buyer of RFID systems in the US is the Federal Government and through the GSA they are provided with a mechanism preferential procurement from Native American Tribes who enjoy various advantageous economic provisions including unlimited government set-asides a various favourable fiscal structures.

I firmly believe that our association with this initiative gives us an invaluable opportunity to benefit from the impending escalation in demand for RFID production capacity from both Governmental and private sectors. I very much look forward to reporting on our progress within this initiative in due course.'

GSA, Mu-Gahut and RFID Economic Empowerment Initiative

General Services Administration ('GSA')

The GSA is a US Federal entity whose mission is to provide goods and services for other Federal Agencies. It is in effect a central buying and contracting organization that is involved with best value acquisitions for work place facilities, expert solutions, and management policies. It consists of the Federal Supply Service (FSS), Federal Technology Service (FTS), Public Buildings Service (PBS), the Office of Governmental Policy (OGP), various staff and 11 Regional Offices. GSA is simultaneously a government full-service department store, a landlord and a purchasing authority.

In 2005 the GSA's budget was in excess of $66 billion, equating to 25% of all Federal procurement dollars.

Through GSA, the US Government provides a method of preferential procureme from Native American companies as well as a range of incentives for the privat sector to utilize Tribal businesses as a primary source for outsourcing or subcontracting. These generous incentives are a powerful means of promoting t

**Exhibit 3**

*P.* (10)                                                            Page 1 of 1



## Pawan Bhat

| | |
|---|---|
| **From:** | Pier Antoniucci [Pier.Antoniucci@WaveZero.com] |
| **Sent:** | Tuesday, February 28, 2006 12:41 PM |
| **To:** | Bhat, Pawan |
| **Subject:** | Delivery to Mu-Gahut |

Hello Pawan,

Please confirm by e-mail the on-site delivery of the first roll-to-roll "flexible" machine to our customer Mu-Gahut.

The e-mail should be addressed to Mu-Gahat, attn. Ray Brown and WaveZero, attention Mr. Baxter Watkins with a statement of the following meaning:
" We understand that Mu-Gahut is the new owner of the "flexible" roll-to-roll machine for RFID antenna manufacturing ordered and paid for by WaveZero.
As per your instructions, instead of delivering the machine ready for shipping, we shall execute "ship-in-place" procedure by withholding it in our premises for factory training. We shall subsequently deliver and install the machine in a location to be determined by you. Factory training may start any time with a week's notice."

Please e- mail to www.mugahat.com and to baxter.watkins@wavezero.com.

Also fax copy of e-mail to Mu-gahat at (408) 745 6584

Thank you

Pier

**Exhibit 4**

*31*

**Pawan Bhat**

| | |
|---|---|
| **From:** | Bhat, Pawan |
| **Sent:** | Tuesday, February 28, 2006 1:11 PM |
| **To:** | 'baxter.watkins@wavezero.com' |
| **Cc:** | 'baxter.watkins@wavezero.com'; Misra, Ashutosh |
| **Subject:** | roll-to-roll "flexible" machine |

## FAXED TO (408) 395 8569

Ray Brown
Mu-Gahat, LLC

Dear Mr. Brown,

This is to inform you about on-site delivery of the first roll-to-roll "flexible" machine to Mu-Gahat, LLC as per instructions from our customer WaveZero, Inc. We understand that Mu-Gahut is the new owner of the "flexible" roll-to-roll machine for RFID antenna manufacturing ordered and paid for by WaveZero. As per your instructions, instead of delivering the machine ready for shipping, we shall execute "ship-in-place" procedure by withholding it in our premises for factory training. We shall subsequently deliver and install the machine in a location to be determined by you. Factory training may start any time with a week's notice.

Please do not hesitate to contact me if you have any questions.

Thank you,

Pawan Bhat Ph.D.
Director of Operations, Thin Film Tools
ITN Energy Systems, Inc
8130 Shaffer Parkway
Littleton, CO 80127
Direct: 303.285.1824
Cell: 303.717.8746
Fax: 303.285.5179

1

*32*

**Pawan Bhat**

| | |
|---|---|
| **From:** | Bhat, Pawan |
| **Sent:** | Tuesday, February 28, 2006 2:02 PM |
| **To:** | 'Pier.Antoniucci@WaveZero.com' |
| **Subject:** | FW: roll-to-roll "flexible" machine |

-----Original Message-----
| | |
|---|---|
| **From:** | **Bhat, Pawan** |
| **Sent:** | Tuesday, February 28, 2006 1:11 PM |
| **To:** | 'baxter.watkins@wavezero.com' |
| **Cc:** | 'baxter.watkins@wavezero.com'; Misra, Ashutosh |
| **Subject:** | roll-to-roll "flexible" machine |

<u>**FAXED TO (408) 395 8569**</u>

Ray Brown
Mu-Gahat, LLC

Dear Mr. Brown,

This is to inform you about on-site delivery of the first roll-to-roll "flexible" machine to Mu-Gahat, LLC as per instructions from our customer WaveZero, Inc. We understand that Mu-Gahut is the new owner of the "flexible" roll-to-roll machine for RFID antenna manufacturing ordered and paid for by WaveZero. As per your instructions, instead of delivering the machine ready for shipping, we shall execute "ship-in-place" procedure by withholding it in our premises for factory training. We shall subsequently deliver and install the machine in a location to be determined by you. Factory training may start any time with a week's notice.

Please do not hesitate to contact me if you have any questions.

Thank you,

Pawan Bhat Ph.D.
Director of Operations, Thin Film Tools
ITN Energy Systems, Inc
8130 Shaffer Parkway
Littleton, CO 80127
Direct: 303.285.1824
Cell: 303.717.8746
Fax: 303.285.5179

1

*33*

early shipment - TF55                                            Page 1 of 1

## Pawan Bhat

**From:**    Bhat, Pawan
**Sent:**    Tuesday, March 14, 2006 1:15 PM
**To:**    'Franco Moriconi'
**Cc:**    Fabrizio Montauti; John Zarganis; Pier Antoniucci; Misra, Ashutosh
**Subject:** RE: early shipment - TF55

Franco,

This is to confirm that ITN will ship one machine, TF55, on this Friday. Our accounting department needs previous invoices to be paid before we ship this machine.

Thanks,

Pawan Bhat

**From:** Franco Moriconi [mailto:Franco.Moriconi@WaveZero.com]
**Sent:** Monday, March 13, 2006 5:12 PM
**To:** Bhat, Pawan
**Cc:** Fabrizio Montauti; John Zarganis; Pier Antoniucci
**Subject:** early shipment - TF55

Pawan:

I appreciate your effort to speed up delivery of the equipment.
As agreed per our phone conversation, I'd like to confirm your shipment of TF55 to Wavezero by this Friday 03/17. We will receive it by mid next week and make plans with you to have it installed in Sunnyvale asap.

Thank you.


Franco Moriconi
Director of Engineering - RF Solutions
408-745-0561 ext 120
franco.moriconi@wavezero.com

Wavezero Inc.
425 Lakeside Drive
Sunnyvale, CA 94089-4704 USA


**Exhibit 5**

34

## Pawan Bhat

| | |
|---|---|
| **From:** | Flynn, Robert |
| **Sent:** | Monday, March 20, 2006 9:34 AM |
| **To:** | Bhat, Pawan |
| **Subject:** | Friday's shipment |

Pawan,
Danzas shipment on Friday info:

Pro # - DEN3110177
ETA in SF, CA - 8AM this morning, western time
www.us.danzas.com

SF office - 415-467-4500, ask for domestic inbound


*Robert Flynn*

Materials & Procurement
ITN Energy Systems, Inc./MicroSat Systems, Inc.
8130 Shaffer Pkwy.
Littleton, CO 80127
main phone - 303-420-1141
direct line - 303-285-1827
fax - 303-345-2251
rflynn@itnes.com

*******************************************************
This message, including any attachments, contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, please contact sender immediately by reply e-mail and destroy all copies. You are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.
*******************************************************

35

*P'd*                                                           

**Pawan Bhat**

| | |
|---|---|
| **From:** | Flynn, Robert |
| **Sent:** | Monday, March 27, 2006 10:21 AM |
| **To:** | Bhat, Pawan |
| **Subject:** | DHL 3/24 shipment to Wavezero |

DHL Danzas pro # - DEN3140073

WWW.us.danzas.com

Local Rep - Yesina Torres - 303-574-8731

SF office - 415-467-4500, ask for domestic inbound


*Robert Flynn*
Materials & Procurement
ITN Energy Systems, Inc./MicroSat Systems, Inc.
8130 Shaffer Pkwy.
Littleton, CO 80127
main phone - 303-420-1141
direct line - 303-285-1827
fax - 303-345-2251
rflynn@itnes.com

***************************************************************
This message, including any attachments, contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, please contact sender immediately by reply e-mail and destroy all copies. You are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.
***************************************************************

1

*36*



THE NEXT WAVE OF ELECTRONIC SHIELDING                    ≈)block

**HOME   COMPANY   INVESTORS   QWIKREPORT   CONTACT US   SEARCH**

🖨 PRINTER FRIENDLY PAGE

## INVESTORS

News Releases
Share Quote
Share Structure
Presentations
Research
Annual Reports
Corporate Governance
Events Calendar
Constitutional Documents
London Stock Exchange Documents

## NEWS RELEASES

**Thu Apr 20, 2006**
**Delivery of First RFID Antenna Machines**

Block Shield is pleased to announce that it has taken delivery and installed the first 4 of its newly developed industrialised RFID antenna production machines. Named 'Flexivol', the new machines have been developed around the Company's core patented methodologies of vacuum deposition of metals on plastic and incorporate 'roll-to-roll' techniques capable of immediate deployment into volume manufacturing environments. Each 'Flexivol' machine is capable of producing a nominal volume of 10million RFID antennas a year and it is the belief of the Board that the new machines represent a major new breakthrough not only for the Company but also the wider RFID industry for two main reason

1. By adopting 'roll-to-roll' techniques enabled by the Company's core patented techniques the 'Flexivol' machines allow antenna to be made in a single, one stop, non additive process. They are, accordingly, environmentally cleaner and inherently the most cost effective manner of mass manufacturing antennas available to the RFID industry; and

2. Due to the strength of the structural bonding between the layers of metal and plastic film produced by the Company's vacuum deposition techniques, any conductive metal, such as aluminium or copper, may be utilized. It follows that metals that are being restricted by the applicable environmental regulations can be eliminated in favour of those that are being permitted.

Of the four machines one has been dedicated to the Company's RFID antenna Research and Development lab, one is operating for the Company's first US licensee and the remaining two are actively running prototype rolls of RFID antennas which are expected to lead to further business results for the Compan from prospective customers committed to adopting the Company's RFID solutio

Dr. Pier Antoniucci, President and CEO, commented:

'In simple terms, we believe that we have created a cost efficient way of delivering high quality performance antennas in an industrialised process; these elements are key to expanding the adoption of RFID to all potential sectors of the industry.

The Flexivol machine is an important milestone for the Company. After two yea of extensive R&D and engineering efforts, the theory has now been taken into operational practice. The Flexivol machines provide the industrial confirmation of the unparalleled suitability of vacuum deposition on plastic for RFID antennas, from the standpoint of cost effectiveness, environmental friendliness and radio electrical performance.

Block Shield continues to industrialize larger machines which are capable of manufacturing 100 million or more antennas per machine per year in view of th expected rapid increase of worldwide RFID applications.'

-Ends-

For Further Information:                                    **Exhibit 6**

Block Shield Corporation plc

Pier Antoniucci (00) 1 408 745 0561

Hansard Communications plc

Andrew Tan 020 7245 1100

You can view the **Next** News Releases item: *Fri Jun 16, 2006, Preliminary Resu*
*Month period Ended 28th February 2006*

You can view the **Previous** News Releases item: *Wed Apr 5, 2006, Notification*

You can return to the main **News Releases** page, or press the **Back** button on
browser.

© 2005 Block Shield Corporation All Rights Reserved. | Disclaimer

*38*

Page 1 of 1

ρ ⑪

**Misra, Mohan**

| From: | Fabrizio Montauti [Fabrizio.Montauti@WaveZero.com] |
|---|---|
| Sent: | Tuesday, May 16, 2006 11:26 AM |
| To: | Bhat, Pawan |
| Cc: | Pier Antoniucci |
| Follow Up Flag: | Follow up |
| Flag Status: | Red |
| Attachments: | Acceptance test_performance_rev051506.doc |

Pawan,

Please find attached copy of our compliance matrix. Please read it and give me your comment, I want to find a solution for a payment to ITN.

Fabrizio

**Exhibit 7**

wavezero

Date: May 12, 2006
Author: Franco Moriconi

# Roll to Roll Sputtering Equipment
## Compliance Matrix

### 1. Introduction

This document reports the result and the compliance status of the acceptance tests performed by WaveZero on roll to roll Sputtering Equipment developed and delivered by ITN. WaveZero has tested two equipments, TF55 for performance with copper target and TF50 for performance with aluminum target. The third equipment, TF45, will be accepted by design rule, meaning that acceptance will depend on performance of TF50 and 55.
This document does not intend to cover the performance of the batch equipment TF35, whose performance will be analyzed in a separate document.
The customer requirements, as specified hereafter, make reference to the document 2005/PB/WZ/CT-04, generated by ITN in agreement with WaveZero engineering as part of the original technical and financial proposal.

### 2. Test Procedures

Both sputtering systems have been tested by using China marker pencils to create the metallization edge necessary to the thickness measurement, and by bringing the samples for measurement to two third party laboratories, Tencor Lab and Charles Evans Associates Lab, that used profilometers Tencor ASIQ, P-2 and P-10 for measuring film thickness. Surface resistance was measured using WZ portable 4-tip Surface Resistivity meater. Surface resistivity is not part of the scope of this document but has been tested as part of a calibration project for future production applications.
TF55 has been tested by using Copper target whereas TF50 was tested by using Aluminum targets. The equipments have been tested with different parameters conditions and only the best results have been considered for the purpose of this document.
The parameters used for verification were:

- Chamber Pressure
- Gas Flow
- Cathodes Power

No masking was used during these acceptance tests.

wavezero

Date: May 12, 2006
Author: Franco Moriconi

### 3. Test Results and Compliance Matrix

| SYSTEM PERFORMANCE | Criteria | Test Result | Compliance Status |
|---|---|---|---|
| Substrate type | Flexible rolls of PET/Vinyl | Both Tested | C |
| Substrate size | Max 300 mm width, length 150 m | | C |
| Deposition area | 300 mm width | 300mm width | C |
| Coating Drum cooling | Inside water cooling, 20°C | 20°C | C |
| Coating Drum heating | Reheating capability | N/A | Waived |
| Film thickness uniformity within substrate thickness | ±10% | +19% -35% on 300 mm | **NC** |
| Target utilization | 35% (or higher on best effort basis) | Not Available | N/A |
| Deposition rate | Up to 50A/sec (up to 100A/sec on best effort) | | C |
| Ultimate vacuum level | below 2 x 10⁻⁵ mbar | | C |
| Chamber pressure range | 1-10 mbar for sputtering | 1-15mbar | C |
| Chamber pressure accuracy | within ±5% | ±5% | C |
| Maximum gas flow rate | Argon gas flow rate of 500 sccm | 500 sccm | C |
| Web Speed | 1-10' per minute | 1-24'/minute | C |
| Distance, source and substrate | Up to 75 mm | 75mm | C |
| Operation mode | Automatic, manual, maintenance modes | | C |
| Web Handling Mechanism | Fully reversible | | C |
| Web shields | provided at appropriate locations | | **NC** Heat balance requires new-design shields |
| Operational manual spare parts list | Provide to WZ | | **NC** |

41



THE NEXT WAVE OF ELECTRONIC SHIELDING    ≋)block:

**HOME    COMPANY    INVESTORS    QWIKREPORT    CONTACT US    SEARCH**

 PRINTER FRIENDLY PAGE

## INVESTORS

News Releases
Share Quote
Share Structure
Presentations
Research
Annual Reports
Corporate Governance
Events Calendar
Constitutional Documents
London Stock Exchange Documents



## NEWS RELEASES

**Fri Jul 28, 2006**
**Sale of Second RFID Manufacturing Machine**

Block Shield, the innovative provider of electronic components and processes utilized in electromagnetic compatibility ('EMC') and Radio Frequency Identification ('RFID') applications, is pleased to announce the sale and delivery of a second RFID manufacturing machine to its Native American Indian licensee, Mu-Gahat Enterprises ('Mu-Gahat'). The sale is the second milestone in a much larger procurement program by Mu-Gahat of industrial equipment and software from Block Shield that is necessary in order for Mu-Gahat to assemble an integrated manufacturing module that is capable of producing high volume RFID tags and antennae.

The Group is also pleased to report that Mu-Gahat has been successful in attracting substantial interest and commitment from two key parties - Chickasa Nation Industry ('CNI') and the University of Oklahoma - which it believes will play a key role in accelerating Mu-Gahat's bid to create an industrial centre for the volume production of RFID tags and antenna.

The progress made by Mu-Gahat led to its immediate need for increased industrial capacity and the purchase of a second 'Flexivol' machine will enable it to produce a further 10 million RFID antennas per annum utilising Block Shield's patented vacuum deposition processes. Mu-Gahat purchased an initial 'Flexivol' machine from the Group in February of this year as part of its major joint initiative with government agencies and other Native American entities to elevate the industrial and technical capabilities of Native American Tribes. This second purchase order has been received ahead of Block Shield manageme expectations and follows commitments received by Mu-Gahat from Chickasaw N Industry ('CNI'), an established and successful Oklahoma based Native America Industrial complex and a recent association with the University of Oklahoma.

The CEO of Mu-Gahat, Mr. Baxter Watkins commented:

'The expansion of Mu-Gahat's industrial program has been accelerated by CNI's recent commitment to provide Mu-Gahat with business development and acces: further government grants as well as its well-established business channels into the US Government. In addition, the recent association of Mu-Gahat with the University of Oklahoma, who have pledged their academic resources to assi in the pursuit of industry leading cost effective manufacturing methodologies based around Block Shield's vacuum deposition techniques, is of particular value to Mu-Gahat due to the University's reputation for having previously consulted with the US Government on aviation applications for RFID and with th University of Arkansas on Wal-mart's commercial logistics program for the broa deployment of RFID technologies.

Block Shield's RFID technology is by far the most competitive industrial production methodologies in the RFID industry. It is our belief that Mu-Gahat's success in attracting such substantial third party commitment is in part due to the compelling features and cost effectiveness of Block Shield's proprietary production techniques. The innovative business thrust which Block Shield provides will now enjoy a business development and commercial connection wit CNI, a large, well established and successful Native American Industrial complex, and the know how and reputation gained by the University of Oklahom

**Exhibit 8**

42

in the specific volume manufacturing application of RFID pursued by Mu-Gahat.

Pier Antonlucci, CEO, commented:

'Our ongoing license agreement with Mu-Gahut has already delivered the RFID Division's second substantial order and I am extremely encouraged to see our licensee commence this next important stage in their development strategy: the establishment of a High Technology Manufacturing Centre capable of servicing high volume business with the US Federal Government directly and other corporations also doing business with the US Federal Government. I am in no doubt that the substantial financial incentives that are in place for corporations seeking to procure items from Native American organisations - coupled with the low manufacturing costs derived from our patented production processes - will lead to the continued success of Mu-Gahat's commercial program. We believe our arrangements with Mu-Gahat, ideally position us to generate significant commercial revenues as Mu-Gahat increases its industrial capacity in order to meet growing demand from both government and commerc organizations. I look forward to reporting on Mu-Gahat's continued progress in due course. This second sale to Mu-Gahat is also pleasing to us as it further demonstrates the Group's ability to derive commercial value from its industrial manufacturing machines and processes. '

-Ends-

For Further Information:

Block Shield Corporation plc

Pier Antonlucci (00) 1 408 745 0561

Hansard Communications

Andrew Tan (00) 44 20 7245 1100

You can view the **Next** News Releases item: *Thu Sep 14, 2006, Trading Update*

You can view the **Previous** News Releases item: *Mon Jul 3, 2006, Notification c*

You can return to the main **News Releases** page, or press the **Back** button on browser.

© 2005 Block Shield Corporation All Rights Reserved. | Disclaimer

43

P (12)                                          Page 1 of 2

## Misra, Mohan

**From:**    Pier Antoniucci [Pier.Antoniucci@WaveZero.com]
**Sent:**    Tuesday, August 08, 2006 5:48 PM
**To:**      Misra, Mohan
**Subject:** RE: Telecon Summary

Hello Mohan,

I agree with the summary of our conversation. Today I have asked our accounting office to process the payment of $100,000.

I appreciate your understanding and your cooperation in regard to the issues we have been having.

We look forward to a quick resolution that will allow us to run the equipment at the expected/specified level of performance.

To this regard, I welcome you visiting us and I look forward to your comments on the gap between actual and expected performance that has prevented us from utilizing the equipment for the manufacturing purposes for which it was commissioned. It is this delay that has been and still is costing us dearly.

Kindly confirm your visiting plans as soon as practical so as to allow us to host you as appropriate.

Kind regards

Pier

**From:** Misra, Mohan [mailto:mmisra@itnes.com]
**Sent:** Monday, August 07, 2006 3:07 PM
**To:** Pier Antoniucci
**Subject:** Telecon Summary

Pier,

It was nice talking to you this morning. Following is my understanding of our conversation today. Please add or delete as you understand.

ITN would definitely like to resolve all the issues as discussed.

Hope to see you soon.

Have fun,

Mohan Misra,Ph.D.
CEO
ITN Energy Systems, Inc.
303-285-5139

Summary of our Telecon today:

1. TF 35, Rigid Substrate –The machine is having problems with its (1) "substrate rotating assembly" and (2) Cooling system.

7/16/2007                                          **Exhibit 9**

44

Page 2 of 2

ITN has agreed to address both the problems.

2. TF 45, TF 50 & TF 55, Roll to Roll on cooled drum – The machines are having problems with "target utilization" and "deposition uniformity".

ITN has agreed to address the problems first by changing the Cathode magnetic consoles. There are nine (9) cathodes and ITN will upgrade all nine. Currently we have one unit under manufacturing, once the results are verified on the first unit; ITN will upgrade the remaining eight (8).

We did also discuss that the process development task need to be performed to optimize the dependent variables such as target utilization, deposition rates, deposition uniformity to yield the maximum production capacity.

Wave Zero, Dr. Pawan Bhat and ITN will work out the scope, cost and the statement of work to remedy above problems as soon as possible.


**Payment**

Wave zero currently owes approximately $300K to ITN; Wave zero has agreed to release $100K right away.

Wavezero will make progress payment based on the task performed by ITN in accordance with the newly developed remedial tasks as outlined above. The progress payments will be adjusted against the remaining balance of $200K to ITN.

Once all the tasks are completed the balance ($200K minus the progress payment made to complete the above tasks) payment will be paid by Wavezero immediately.

7/16/2007

45

1

## PROOF OF SERVICE

2

STATE OF CALIFORNIA    )
3
                                ) ss.
COUNTY OF LOS ANGELES )
4

5
I am employed in the County of Los Angeles, State of California. I am over the age of eighteen and not a party to the within action; my business address is: HOGAN & HARTSON, LLP, 1999 Avenue of the Stars, Suite 1400, Los Angeles, CA 90067
6
On, July 25, 2007, I caused the foregoing documents described as:
7

### COUNTERCLAIMS

8

to be served on the interested parties in this action by placing ___ the original X a
9
true copy thereof enclosed in sealed envelopes addressed as follows:

10
**FENN C. HORTON III, ESQ.**
**MICHAEL J. CHENG, ESQ.**
11
**PAHL & MCCAY, P.C.**
**225 WEST SANTA CLARA STREET,**
12
**SUITE 1500**
**SAN JOSE, CA 95113-1752**
13
**TELEPHONE: (408) 286-5100**
**FACSIMILE: (408) 286-5722**
14

15
[ ]    **BY MAIL.** I am "readily familiar" with the firm's practice of collection and
16
processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepared at Los Angeles, California in the ordinary course of business. I am
17
aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of
18
deposit for mailing in affidavit.

19
[X]    **BY HAND DELIVERY.** I caused such envelope to be delivered by hand to the offices of the addressee(s) following ordinary business practices.
20

21
[ ]    **BY FACSIMILE.** I caused such document to be delivered by facsimile to the offices of the addressee(s) following ordinary business practices.

22
[ ]    **BY UNITED PARCEL SERVICE.** I caused such document to be delivered
23
by overnight mail to the offices of the addressee(s) by placing it for collection by United Parcel Service following ordinary business practices by my firm, to wit, that packages will either be picked up from my firm by United Parcel
24
Service and/or delivered by my firm to the United Parcel Service office.

25
[X]    (Federal) I declare that I am employed in the office of a member of the bar of
26
this court at whose direction the service was made. Executed on July 25, 2007, at Los Angeles, California.

27

28
Renee Sherriff
Print Name                                  Signature